## E. I. DU PONT DE NEMOURS & CO. v. UNITED STATES (No. 4244)[1]

United States Court of Customs and Patent Appeals, October 30, 1939

*Lamb & Lerch* (*John G. Lerch* and *David A. Golden* of counsel) for appellant.
*Webster J. Oliver*, Assistant Attorney General (*Daniel G. McGrath,* special attorney, of counsel), for the United States.

[Oral argument October 6, 1939, by Mr. John G. Lerch and Mr. McGrath]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON Associate Judges

LENROOT, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court (Second Division) overruling a protest and affirming the classification of certain merchandise by the collector of the port of Norfolk, Va., the merchandise consisting of two machines known as Continuous Colin Presses. The merchandise was classified under paragraph 372 of the Tariff Act of 1930 and assessed with duty at the rate of 40 per centum ad valorem as "textile machinery, finished or unfinished, not specially provided for."

[1] C. A. D. 75.

The protest claimed that the merchandise is dutiable under the same paragraph, but at the rate of 27½ per centum ad valorem as "all other machines, finished or unfinished, not specially provided for."

The involved provisions of paragraph 372 read as follows:

PAR. 372. * * * knitting, braiding, lace braiding, and insulating machines, and all other similar textile machinery, finished or unfinished, not specially provided for, 40 per centum ad valorem; all other textile machinery, finished or unfinished, not specially provided for, 40 per centum ad valorem; * * * all other machines, finished or unfinished, not specially provided for, 27½ per centum ad valorem; * * *.

Upon the trial before the Customs Court the evidence consisted of the testimony of one witness in behalf of appellant and four exhibits, viz, a drawing representing the machines involved, a jar containing cellulose acetate in its condition before entering the machine; a jar of the same material in its condition after having passed through the machine, and three photographs of certain parts of the machine.

The Government offered no evidence.

Appellant's witness, Paul Knapp, testified that he was the chemical supervisor of appellant's plant at Waynesboro, Va., and that said plant operates entirely on cellulose acetate, which he described as follows:

Cellulose acetate is a compound of cellulose made by treating cotton linters in acetic acid, which produces what is known to chemists as amorphous matter. In fact it has the general appearance of wood pulp, purified wood pulp.

The witness testified that he was familiar with all the equipment at said plant and the two presses here involved, which were installed therein. He further testified as follows:

Q. Now, will you look at Exhibit 1 and state in as plain untechnical language as you can just how these presses work, following the operation from start to finish?—A. The wet cellulose acetate is allowed to fall into the hopper shown on the right-hand diagram under the word "longitudinale", and after falling through the hopper inlet it falls on to a screw, clearly shown in the cross section below the hopper in light. The screw is turning slowly and the cellulose acetate is advanced to the left, where, finally after advancing about three feet, it meets an adjustable cone shown directly under 6052. The adjustable cone acts as a block mechanism, whereby the screw is enabled to force the cellulose acetate against this block device, thereby pressing water out of the cellulose acetate, and nothing happens during this traverse of the cellulose acetate, except to get rid of some water. The water as squeezed from the cellulose acetate passes out through the screen that surrounds the screw, shown as number 6069. The screw is perforated and the water drops by gravitation from the screw, and is carried away to the sewer. The cellulose acetate finds its way out around the adjustable cone and drops into the shoot or hopper just above the number 6129. At this point the cellulose acetate is somewhat drier than when it was allowed to fall by gravity into the hopper as originally described. The screw is driven by the mechanism shown at the extreme right-hand side of the diagram, spiked to the screw mechanism, it is driven by the gear mechanism at the right-hand side of the drawing. The con-

necting shaft for this drier mechanism is shown under the words "Vue de l'Arriere." This connecting shaft is shown in detail near the number 6035, which is crossed up on this drawing, but demonstrates where the moving shaft is found. This shaft has mounted on it two pulleys. The one near the end of the shaft is supported by what is formally known as a post.

He further testified that the only function performed by the machine was the reduction of the water content of the cellulose acetate from 82 or 83 per centum to 49 or 50 per centum. In other words, the machine removes about 32 per centum of water from the material, and the witness testified that in this operation there was no change in the basic substance, chemically or physically.

Upon cross-examination the witness testified as follows:

X Q. Tell me what your plant makes?—A. It makes cellulose acetate which finds uses in rayon plastic goods, lacquers and photo films, and we make in the plant a cellulose film and rayon.

X Q. Is this rayon known as artificial silk?—A. The word "artificial silk" has been completely dropped in the industry.

X Q. But that was what was formerly known as artificial silk?—A. Several years ago.

X Q. Will you tell me what we start with?—A. Quite a ways back in the process of making cellulose acetate; the name itself, cellulose acetate.

X Q. Give me the character of what we start with?—A. The type we use is cotton linters. They are treated under proper conditions with acetic acid.

X Q. So that before you put that material into this machine it contains cotton linters?—A. Chemically changed into cellulose acetate. They are one of the substances used.

X Q. Will you describe the different steps that we go through before we reach the stage shown by illustrative exhibit "A." I don't want you to repeat, just give me any other steps you may have omitted?—A. I have already stated that cotton is treated·with acetic acid.

X Q. What then?—A. The mixture is converted into cellulose acetate and that procedure is followed by precipitating the whole mass in water. The object of doing that is to take the excessive acetic acid back into the operation for recovery.

X Q. So that the machine does something else besides extracting water?—A. That process is done prior to the time this material reaches this machine. In fact I might say this is done in another part of the building. In producing the finished material you go through several processes and steps. If you are referring to the material we make from the cellulose acetate, we go through several steps in that.

X Q. Will you describe these briefly?—A. In the manufacture of rayon this material is put into a solution of acetone and forced out through a nozzle, called in our business a spinnerette. After forcing the solution out through the spinnerette the acetone is driven off and you have remaining a filament. Now to go to another use of the material, we also in this case put it in solution in acetone. We add certain materials and then spread it out to dry on a highly polished drum. While it is spread on the drum surface the acetone is evaporated by a well known procedure, leaving behind a thin sheet, and we use that as windows in envelopes as well as in wrapping boxes of merchandise.

X Q. Is not this used principally as rayon?—A. One of the principal uses is rayon.

The trial court held, Judge Tilson dissenting, that the involved machines are textile machinery and that they were dutiable as classified by the collector.

Judgment was entered accordingly, overruling the protest, and from such judgment this appeal was taken.

It is the contention of appellant that, inasmuch as the only function performed by the machines in question is a drying operation, and no manufacturing process is involved in their operation, they cannot be held to be textile machinery under paragraph 372. It is also contended that, inasmuch as the material which passes through the machines has uses other than for the manufacture of a textile material, the machines are not textile machinery.

With respect to this latter contention, the testimony is that one of the principal uses of the material is for the manufacture of rayon, which is a textile material.

For the purposes of this case we must presume that such use is the principal use of the material passing through the machines. It is well established that the collector is presumed to have found every fact to exist that was necessary to sustain his classification. *United States* v. *Marshall Field & Co.*, 17 C. C. P. A. (Customs) 1, T. D. 43309. There is no evidence in the record overcoming the presumption that the chief use of the material was for the manufacture of rayon.

If a machine is chiefly used in the manufacture of textile material, it is textile machinery. See *United States* v. *Hempstead & Son*, 3 Ct. Cust. Appls. 436, T. D. 33004; *United States* v. *Boker & Co.*, 6 Ct. Cust. Appls. 243, T. D. 35472. The fact that a minor portion of the material upon which the machines operate is used for purposes other than textile material cannot in our opinion affect the classification of the machines here involved.

The question of what constitutes textile machinery has been before this court in a number of cases. In the case of *Whitlock Cordage Co.* v. *United States*, 13 Ct. Cust. Appls. 656, T. D. 41490, this court held that the term "textile machinery" as used in the Tariff Act of 1922 includes machines which are used in the manufacture of textiles. This definition has been repeatedly affirmed by us.

In the case of *Passaic Worsted Co. et al.* v. *United States*, 17 C. C. P. A. (Customs) 459, T. D. 43916, we held that machines for merely cleaning wool were not textile machines because they were not used in the manufacture of textile materials. In our opinion in that case we said:

* * * Ever since the creation of this court it has held, consistently, that the mere cleansing of an article, or "getting it by itself," is not a manufacturing process. * * *

It is true that this language is subject to the implication that, for an article to be a textile machine, it must perform some manufacturing

process. However, such implication has been removed by us in subsequent cases.

In the case of *Jefferson (Inc.)* v. *United States*, 18 C. C. P. A. (Customs) 322, T. D. 44583, the question determined was whether certain machines known as backwashing machines, used in washing and cleansing wool slivers in the process of their manufacture into yarn were properly classified as textile machinery. It appears that in preparing wool slivers for manufacture into yarn oil was introduced into the material and the machines there involved were used solely for the purpose of taking out the oil which had been so introduced. In our opinion holding that the machines were textile machinery we referred to the case of *Passaic Worsted Co. et al.* v. *United States, supra,* stating:

> While, as said in the *Passaic* case, *supra,* the court "has consistently held that the mere cleansing of an article, or 'getting it by itself,' is not a manufacturing process," obviously, the holdings along that line have gone no further than to so designate those cleansing and separating steps which are taken for the purpose of putting the raw material in decent and workable condition. The doctrine may not properly be extended to cover a step which, for actual manufacturing purposes, removes an ingredient previously injected, this injection being itself for a manufacturing purpose.

So in the case at bar the only use of the involved machines is to extract water from the material, which water had been previously introduced after a manufacturing process had been employed, viz, the introduction of acetic acid into cotton linters to produce cellulose acetate.

It seems to us that the extraction of the oil which had been previously introduced into the material involved in the *Jefferson* case, *supra,* was no more a manufacturing process than the extraction of water from the material involved in the case at bar.

In the case of *Jett & Co.* v. *United States*, 18 C. C. P. A. (Customs) 86, T. D. 44044, a number of machines were involved which had been classified as textile machinery. Two of the machines merely stirred or agitated textile material in a tank. We affirmed the trial court's holding, overruling the protest. We concluded our opinion with the following:

> We hold that the machines in issue are used in the manufacture of a textile material. They are therefore textile machinery and were properly classified by the collector.

In the case of *Baltimore & Ohio Railroad Co., etc.* v. *United States*, 22 C. C. P. A. (Customs) 592, T. D. 47586, the question arose of the definition of the term "textile machinery." We said in our opinion:

> * * * Necessarily, the production of artificial silk yarn employs a method involving several steps, and all machinery involved in the process of making textile yarns or threads is textile machinery.

We do not see how it can be successfully argued that the machinery here in issue is not used in the process of making rayon.

The case of *United States* v. *American Textile Engineering, Inc.*, 26 C. C. P. A. (Customs) 48, T. D. 49597, involved the classification of a Hygrolit machine, which was used in steaming yarn and spraying it with a solution known as "Hygrolit." The process employed was termed a yarn conditioning process and lessened the tendency of the yarn to kink. It was there argued by counsel for appellee that the process performed by the machine in question was not a manufacturing process. In our opinion we stated:

It may be that the language used in the *Passaic Worsted Co. et al.* case, *supra*, restated and followed in the *Jett & Co.* and *Edward Jefferson (Inc.)* cases, *supra*, is open to the interpretation placed upon it by counsel for appellee. However, as is apparent from our decision in the latter case, this court, in stating in those decisions that a textile machine was one used in the manufacture of textile materials, did not mean to be understood as holding that *only such machines as actually converted a material into a new material or article having a new name, character, or use* were intended by the Congress to be included within the statutory provisions for all other textile machinery.

It may require more than one manufacturing process to convert a textile material into a new textile material having a new name, character, or use. Indeed it appears from the Summary of Tariff Information, 1929, Vol. 1, pp. 823–835 (prepared by the United States Tariff Commission for the use of the Committee on Ways and Means of the House of Representatives), that many machines referred to therein as textile machinery, such as "machines for winding both raw silk and spun silk, as well as rayon, into various forms, bobbins, cops, skeins, 'beams' and there are other shapes for dyeing, or weaving in the loom," have nothing whatsoever to do with changing the character of the material on which they operate.

As hereinbefore stated, we have repeatedly held that the term "all other textile machinery" includes machines which "are used in the manufacture of a textile material." It seems to us that the clear meaning of this language is that any machine which is chiefly used for performing a step in the process of manufacturing textile materials is textile machinery.

It will be noted from our quotation from the case of *United States* v. *American Textile Engineering, Inc.*, *supra*, that we there referred to the Summary of Tariff Information, 1929, which mentioned several devices as being textile machinery. A device for winding rayon upon bobbins referred to in said Summary of Tariff Information does not involve a manufacturing process upon the rayon, and is no more essential in the production of rayon than is the step here involved of extracting water from the cellulose acetate material.

While it is true that in some of the cases decided by us a manufacturing process was involved in the use of the machines under consideration, and we have emphasized that fact, we have nowhere held that, in order to classify a machine as textile machinery, it is indis-

152

pensable that the step performed by the machine must be a manufacturing process.

It is true that the first step in the manufacture of textile materials must be one which initiates such manufacture, thus distinguishing between the cases of *Passaic Worsted Co. et al.* v. *United States, supra*, and *Jett & Co.* v. *United States, supra;* but after this first step is taken and the process of the manufacture of textile material has begun, we hold that any machine chiefly employed to perform any step in such process [as well as any machine employed in said first step] is textile machinery, regardless of whether the particular step employed in a given case is in itself a manufacturing process.

In the case at bar the process of manufacturing cotton linters into a textile material had begun by the use of acetic acid, producing cellulose acetate. The step here involved of extracting water from the material was an intermediate step and was used in the manufacture of a textile material.

It follows from the foregoing that we must hold that the involved machines are textile machinery, and the judgment appealed from should be, and is, *affirmed.*